The Surrogate.
The deceased was a native of France, who came to this country about 1849, and became a citizen of the United States by acts of natural *179 ization, and died at the age of over sixty years, at St. Vincent’s Hospital, in this city, on February 20, 1871. He left a paper propounded as his last will and testament, bearing date and executed on the 14th day of that month, which is as follows:
“ The Last Will and Testament of Louis Bonard.
u “In the name of God, Amen. I, Louis Bonard, of the city of New York, being of sound mind and memory, and considering the uncertainty of this life, do therefore make, ordain, publish and declare this to be my last will and testament—that is to say: First: After all my lawful debts are paid and discharged, I give and bequeath and devise unto the “American Society for the Prevention of Cruelty to Animals,”' (of which said society Henry Bergh, Esquire, of the city of New York, is president, and for whom I have long entertained, and now entertain, the highest respect and admiration, he being a gentleman whose laudable, .untiring and humane exertions on behalf of the dumb portion of God’s creatures has elevated him in my estimation far above any other man I know or have heard of), all and singular my real estate, property, lands, tenements, houses, messuages, and lots of ground, wheresoever the same may be found or situate, together with all the hereditaments and appurtenances thereunto belonging or in any wise appertaining—including : [here follows a description of the real éstate.]
“To have and to hold all my said hereinbefore devised real estate and immovable ■ property, lands, houses, messuages, tenements and lots of ground, with their, and each and every of their hereditaments and appurtenances, unto the said “American. Society for the Prevention of Cruelty to Animals,” as its own proper freehold and absolute property, free from all incumbrances, to be by the said society and the said president thereof, used, occupied, enjoyed, and disposed of for the benefit of the said society in such *180 manner as to the said president thereof shall seem meet and proper.
“I also give and bequeath unto the said ‘ American Society for the Prevention of Cruelty to Animals,’ all and singular my movable property, goods, chattels and effects, and moneys, and sums of money, and debts, and accounts due me, and checks, bills, and promissory notes, and bank-book and bank account, and all sums of money which from any source shall in any wise hereafter become due and payable to me, and every other thing of any value which I.possess now or may hereafter become possessed of, to be by the said ‘ American Society for the Prevention of Cruelty to Animals,’ and the president thereof, appropriated and applied to the use and for the benefit and furtherance of the humane objects of said society. In fact, I will, order and desire, that ever}7thing I am now possessed of, or hereafter may be possessed of, and all my property, real and personal, movable and immovable, shall be the sole and absolute property of the said ‘ Society for the Prevention of Cruelty to Animals,’ after my decease.
“ I further will and desire that all my said real property shall be by the said ‘American Society for the Prevention of Cruelty to Animals,’ retained in its ownership and possession for its benefit, and not sold or aliened by said society, or transferred to any other person, or society, or owner whomsoever.
“And further, I will and order that all moneys or sums of money, which may be coming to the said ‘ Society for the Prevention of Cruelty to Animals ’ from any source by virtue of this will, shall be invested in real estate property by my executors hereinafter named, for the sole, exclusive and perpetual use, benefit and enjoyment, of the said ‘American Society for the Prevention of Cruelty to Animals.’
“Likewise, I make, constitute, and appoint Henry *181 Bergh, Esq., president of said society, and Archibald H. Campbell, Esq., his associate, to be executors of this my last will and testament, hereby revoking all former wills by me made.
“In witness whereof,” &c. [Here followed the usual clauses of attestation, with signatures.]
According to the petition for probate filed by one of the executors, the decedent left him surviving no known heirs or. next of kin.
On the return day of the citation, which was issued and published according to law, counsel appeared for the executors and sole legatee named in the will, and other counsel appeared, in opposition, for certain legatees mentioned in an instrument of prior date, which has been offered for probate, but is not directly at issue in this present controversy; and other counsel also appeared to oppose on behalf of the Consul-General of France intervening for alleged next of kin and heirs in that country.
Objections to such probate of the instrument in question, were filed by said contestants, all of whom, in substance, alleged that the same was not the last will and testament of the decedent; that it was not his free, unconstrained and voluntary act; and the objections of the counsel for the Consul-General, also alleged that the decedent “wras not of sound mind, memory and understanding; but, on the contrary, that his mind was unsound, his memory impaired, and his understanding weakened by sickness and various other causes ;” and, further, that “at the time of the execution of the said instrument, and for a long time prior thereto, the said Bonard was affected by, and subject to, insane delusion, which guided and controlled him in the execution of said last will and testament; and that, had it not been for the existence of such insane delusion, he would not have executed said instrument purporting to be his last will and testament, and which *182 instrument wholly disregards the claims of those who should, and otherwise would,-have been objects of his bounty.”
It appears from the testimony that all the formalities of execution required by the statute of wills of real and personal estate were complied with, and this was not disputed by either of the counsel for contestants, on the argument
I. The first question in the case, therefore, to be considered, is, that of testamentary capacity ; and the inquiry, on the objections and testimony before me is, mainly, whether the decedent, at the time he executed the alleged will, was of that sound mind and disposing memory which the law requires to be possessed by a testator, or whether the doctrine of metempsychosis, alleged to have been believed by the decedent, constituted such insane delusion as to have so operated upon his mind that he was rendered incapable of making a testamentary disposition of his estate.
Several witnesses, called by the counsel for the alleged next of kin and heirs, testified to. statements made by the decedent, wherein he expressed the belief, at different times, that the souls of men, after death, passed into animals. It was, therefore, urged that this belief was an insane delusion, and that it so affected Ms mind against the natural claims of relatives as to influence him to bestow all his property, real and personal, upon the “American Society for the Prevention of Cruelty to Animals,” named as the sole legatee of the will in question.
There was no important amount of evidence adduced, otherwise, tending to show an insane mind. He was a man of fair education and intelligence; his habits were frugal and temperate ; he gave his personal attention to his property, which, by his industry and watchfulness, had accumulated to a large amount.
This belief of what is known as metempsychosis, *183 which, simply stated, is a speculation as to the destiny of the soul after death, is urged as an evidence of the insanity of the testator.
To no human being has been given the positive knowledge of an existence after death. The instincts of the human mind prompt us to believe, or at least to hope, that, although there may be a death of the body, yet that there is an intellectual or spiritual part of our nature which survives in some form or other. But, in a logical sense, there is no major premise of knowledge ; it is, to all of us either a matter of speculation, or a belief based on the religious doctrine or tenets which we accept. To almost every man there is, to to him, some evidence that there is a higher power, whatever that power may be, which has created this world, and which governs it. The manifestations which surround him on every side, confirm him in that belief, though what that power or Being is, he can, with his finite knowledge, have no definite conception; and, therefore, his views as to a future state rest merely on philosophical speculation, or the faith of that religion which he accepts as his creed and is taught by its priests ; and “faith is the evidence of things not seen.” The world is divided into many sects, each sect presenting a creed more or less different as to a future state. This very doctrine, metempsychosis, as shown in this case, has been believed in by Pythagoras, Plato, and others of the ancient philosophers, and sages of the East, and even, in modern times, by intellectual, wise, and good men, and is, at this day, accepted by a larger portion of the human race, on the globe, at large, than those who reject it.
Having seriously considered this subject, with reference to the nature and limited capabilities of the human mind, and the differences not only of race, but -of men of the same race, living under the same civil and religious institutions, and resulting from origin, edu *184 cation and circumstances ; and also borne in mind the freedom of individual conscience, favored by the society in which we dwell, and by our laws, and the multifarious fofms and shades of opinion, on all subjects, which are consequently engendered among ns, and must be tolerated, whether as means of arriving at truth itself, or, as wise, or mistaken, methods of happiness, which each person has a right to select for himself, or as heresies and error in individual cases, inevitably growing out of the large liberty accorded to all; and taking, as 1 feel compelled, a comprehensive and liberal view of the subject,—my reflections have led me to say that I can not commit myself to what I would deem an extravagant and unjust stretch of judgment of a court of justice, to hold, upon the question of the condition or destiny of the soul of man, after the death of the' body,—of which no man has more positive knowledge than can be expressed by his individual belief,—that insanity, or a delusion, to be characterized as insane, as respects competency to dispose of property by will, for a purpose, which might not, otherwise, than for an alleged delusion, have been entertained, but which pur-, pose, in itself considered, is entirely rational and explicable on other grounds, is to be ascribed to one who honestly and sincerely had faith in the doctrine of metempsychosis, and who, having no family or any near or known remote relations, bequeathed his entire estate to or for a society for the prevention of cruelty to animals.
It appears to me that, if a judicial officer should assume, that merely because a man earnestly believed in that doctrine, he was insane or labored under an insane delusion, or monomania., incapacitating him for making a will, if prompted by that faith, but, though consistent with it, wholly rational in its provisions, it would not fall very far short, in principle, of assuming that all mankind who do not believe in the uarticular *185 faith which the judge accepts, respecting the future state, are more or less insane, or the victims of an insane delusion.
This question is entirely within the domain of opinion, or faith, and not of knowledge. A man may properly be assumed insane upon evidence that he is governed by hallucinations which are physically impossible to the knowledge of all sane men, and which are contrary to the evidence of the senses, or who is influenced by delusions, which are the creation of diseased reflective faculties.
Hence, the opinion as to a future state, of which no man has positive knowledge, and in regard to which mankind have always differed, and do widely differ today, even in the most civilized countries, and among the most intellectual of men, can not, in any respect, be deemed evidence of insanity ; the only rule by which the insanity of one of certain opinions can be determined, being by some test founded on positive knowledge.
The insanity of an opinion must be established only with reference to means of knowledge accessible to men of common minds and understanding, and not upon the results of- profound scientific researches or experiment, or scholastic theology, or religious tenets concerning the nature of the infinite, or the destiny of the race beyond the present, which, itself, is too vast and mysterious a domain for the finite mind to comprehend ; and if we are so much at fault, or deficient, and so at variance in opinion of the truth of the present, how can we presume to hold one insane, as to our nature and destiny in the future ?
Moreover, if a court is to ascribe insanity to a man, or a class of men constituting a sect, on account of his or their opinion or belief as to a future- state, and a particular sect had, in fact, attained to a real knowledge of that future, the logical deduction would necessarily be, *186 that a major portion of mankind, comprised in all other and different sects, were of unsound mind or monomaniacs on that • subject. If it be the case that such knowledge has been so attained by a sect or known body of believers, the question remains, which it is, and what tribunal is to exercise the judgment cf determination.
But what degree of practical importance has the question of the testator’s belief in the peculiar doctrine referred to, in this case ?
It is not proved that any act of his life in regard to Ms property was insane, or that the peculiar opinion entertained by him, respecting the destiny of man or the form or condition of his future existence, and claimed to be a sign of mental disease, or of an unsound mind, manifested itself in the use or disposition he made of his money or property, in his lifetime, or that the management of his affairs was characterized, in any manner, by such, or, any, peculiar opinions concerning the nature of man or his future life ; and, so far as the proof appears in this case, the testator’s general con duct of his business affairs did not distinguish him from a multitude about him ; and in his, no more than in their case, indicated unsoundness of mind.
But it is not strongly claimed that the testator was otherwise unsound in mind than that he was a monomaniac on the subject of the transmigration of souls, and that, in consequence of that, he made the will in question. There is no proof of any declarations he ever made connecting such opinions with his intended disposition of property by will. Mo such opinions were expressed or alluded to, nor was there any conversation on the subject, when the will was prepared or executed, nor does it appear that he alluded to any such opinions, for along time before, thong li he may have entertained them. It does, however, appear, that in his last illness, and about the day the will was made, the testator re *187 ceived the Holy Sacrament at the hands of a priest of the Catholic Church, to which he had formerly belonged, and in which he was reared. It therefore seems to be an inference only, that the will was the offspring of those opinions. I cannot decide such to be the fact, on the evidence. The will is silent about such opinions, and, in none of its provisions, imports that the testator held them. It justas much imports that his opinions were those of annihilation, or that no soul survives the body, and probably it would not be claimed that the believers in that doctrine are, on that ground alone, incompetent to make a will; and in fact, a will, such as is before me, though nothing is given to individuals, or for the direct benefit of the human, race, does not necessarily import that the testator was not a believer in the most enlightened religion known in our midst. It would, it is trae, be a singular act for one thus enlightened, so to devote a large estate, but the object is a very worthy one, and has the commendation, and commands the respect, of the best minds, and the sympathies of all humane- people. The commission of cruelty to certain useful animals has long been punishable in this State as a misdemeanor, and the prevention of such cruelty, besides being right, has even its salutary moral effectupon man himself, in the sense that all forms of cruelty inflicted by Mm are, moré or less, the expression of violent passion or of insensibility, tending to retard his own moral advancement; and now, organizations to prevent cruelty to animals exist extensively here and in Europe, and to that object, liberal contributions are made by our most charitable and thoughtful citizens from year to year, and no reflecting person will withhold his approval of expenditures of money for the purpose, as among the laudable movements of the age. How, then, can it be urged that the bequest of the testator’s entire property to the society named, is either, in itself, irrational, or not reconcilable with a sound mind, or *188 that it implies even a belief in the transmigration of souls of men after death, any more, necessarily, than any other forms of belief, that are, generally, in our country accepted as true 1 It is, then, impossible, or it would certainly be a violation"ÓT established principles of law, for me to hold this will to be wholly the offspring of the peculiar opinions of the testator respecting the souls of men in the future, when the case entirely lacks evidence of declarations by Mm, connecting those opinions with the testamentary act, or expressing a purpose of making such a will because he so believed; and I am not prepared to say that, even if such evidence had been produced, I would feel required to take a different view of the sanity of the act, when, as in this case, the testator had neither wife nor child, father or mother, or any known, near or remote, relatives living on the earth, or others on whom hé was, or felt himself, under obligation, to bestow his property. lie had no relatives known to Mm,—none had followed him in his career, or taken any interest in his welfare, comfort or happiness ;—and not until after a long life, successful in the accumulation of an estate, and after the journals had promulgated, here and abroad, that quite a fortune is left, is there any claim of relationship to him ; and while the French Consul-General at New York has properly intervened in these proceedings, to save the legal rights 'of the subjects of France, who may be heirs at law or next of kin to the testator, and, by his counsel, has diligently performed his duty to his government, and by his agents in France, endeavored to make known, there, the pendency of these proceedings, the period of over eighteen months has elapsed since testator’s death, and it is not yet clear to me that a single heir-at-law or next of kin in fact, has presented himself, although months ago a commission was issued to France, at the instance of the consul-general, to take proof on the subject, but is not yet returned as exe *189 cuted. So that the argument, made at the early stage of this preceding, and since, that this will ignores the claims of relatives upon testator's bounty, and should be looked upon with disfavor or suspicion, has quite lost such degree of force as it originally had.
The result of my reflections on this branch of the case is, therefore, that the will in question is not impeached as a testamentary paper, on the ground of the mental incapacity of the testator.
The question of mental capacity having therefore been determined, as well as that of proper execution, the instrument propounded would be entitled to admission to probate as the last will and testament of decedent, as an entii'ety, unless there be ground for a different decision in respect of its constituting such last-will, depending on my determination of the question of the validity of the devise and bequest contained in the paper ; the same having been submitted to my decision under Laws of 1870, ch. 359, § 11, which is as follows :
“In any proceeding before the said surrogate to prove the last will and testament of any deceased person, as a will of real or personal estate, or of both real and personal estate, in case the validi ty of any of the dispositions contained in such will is contested, or their construction or legal effect called in question by any of the heirs or next of kin of the deceased, or any legatee or devisee named in the will, the surrogate shall have the same power and jurisdiction as is now vested in and exercised by the supreme court to pass upon and determine the true construction, validity and legal effect thereof ; he shall enter in his minutes any decision he may make in relation thereto, and any of the heirs or next of kin of the deceased, or any of such legatees or devisees, may appeal therefrom in the same manner, and with the same effect, in every respect, as is now provided by law in relation to appeals from decisions *190 of surrogates, admitting wills to probate or refusing the same.”
II. As to the validity of the devise of the real estate of which decedent died seized.
The statutes of this State, applicable to this question, provide,, that all persons, except idiots, persons of unsound mind and infants, may devise their real estate by a last will and testament, duly executed, according to the provisions of this title.
Every estate and interest in real property, descendible to heirs, may be so devised.
Such devise may be made to every person capable by law of holding real estate ; but no devise to a corporation shall be valid unless such corporation shall be expressly authorized by its charter, or by statute, to take by devise.
The sole devisee of the real estate of decedent is “ The, American Society for the Prevention of Cruelty to Animals,” a corporation created by special act of the legislature, passed April 10, 1866. It is not disputed that the charter of said corporation, as it existed at the time of testator’s decease, contained no words expressly authorizing it to take real estate by devise, and the invalidity of the devise in question is so apparent as to require no discussion whatever, were it not that the counsel for the said society offered in evidence an act of the legislature, passed March 8, 1871, which is as follows:
Seo. 1. “The American Society for the Prevention of Cruelty to Animals, a corporation created by an act of the legislature of this State, passed April 10, 1866, is hereby authorized and empowered to take, hold, use and enjoin all the lands, tenements and hereditaments which were, by the last will of Louis Bonard, devised unto the said corporation, for the uses and purposes in said will expressed. And1 all the estate, claim, right, title and interest of the people of this State, of, in, and *191 to, said lands, tenements and hereditaments, and every part thereof, are hereby released, granted, confirmed to and vested in said corporation.
Sec. 2. “The sixth section of an act entitled “An act to incorporate the American Society for the Prevention of Cruelty to Animals,” passed April 10, 1806, is hereby amended and shall read as follows :
Sec. 6. “ This corporation shall be capable of taking-, holding and enjoying any real property by virtue of any deed, or of any devise contained .in the last will of any person whomsoever, subject to the provisions of law relating to devises by last will. But this corporation shall not in its corporate capacity hold real estate, the yearly income derived from which shall exceed the sum of fifty thousand dollars.
Sec. 3. “Nothing in this act contained shall in any manner affect the right of any heir or. creditor of the late Louis Bonard.
Sec. 4. “ This act shall take effect immediately.”
The counsel for the society, in his argument, admitted the invalidity of the devise, and that the society did not claim such real estate under the will, but by virtue of the act last referred to ; and submitted to the court that it was proper for it to pass upon the effect of that enabling statute, in determining what disposition is to be made of the real estate here.
I do not deem it any part of my province to entertain the question of the effect of that special act.
If the lands, so in terms devised, escheated to the State, on account of the invalidity of the devise, and the non-existence of heirs capable of inheriting the real estate of testator, the escheat was effectual at the instant of testator’s decease, and no enabling act could be rendered lawfully retroactive, to invest the society with power to take any real estate by previous devise, the invalidity of which, at the time, either rendered the real estate inheritable at the instant of death by the *192 heirs at law, or escheated to the State for want of such heirs.
The only question which it is proper for me. to decide as to such real estate is, not, who are now vested with the title, or may enforce the-rights of any party now lawfully claiming the same, whether it be the society by such enabling act, or any individuals, otherwise claiming ; but simply whether the devise was valid, and if not valid, it would follow as a consequence that the testator died intestate as to such real estate. To entertain jurisdiction of what disposition is to be made of the same real estate, as claimed under that act, would be equivalent to trying the title to the real estate as between the society, not as devisees, but as subsequent grantees of the State, and others who may, or might, claim as heirs at law.
I must, therefore, hold that the direct devise of the real estate to the society is invalid, and wholly inoperative by law.
III. As to the validity and effect of the bequest of •the personal property, which is as follows: [The learned surrogate here quoted the third paragraph of (A2rxx.se fourth of the will, which will be found on p. 180 above.]
It is claimed by counsel for two legatees under an alleged former will of testator, dated February 11,1871, (and which is now on file in this court, and propounded for probate, but not yet otherwise acted upon): That under its provisions there is an equitable conversion, at his decease, of the personal property of the testator into real estate for all the purposes of the instrument, and that he assumed to devise the entire property to an incorporated society, therein named :
That such incorporated society was not, at the time of the death of said Louis Bonard, or at any time prior thereto, authorized by law to take by devise :
That the disposition of the property in favor of said *193 society was for uses and upon trusts, which were unauthorized by law, and in contravention of the statutes in such case made and provided:
That each disposition in said instrument which the testator assumed to make of his property of each kind and description was in contravention of the statutes prohibiting the suspension of the power of alienation of real estate, and of the absolute ownership of personal property, for periods not measured by lives in being, or by such lives and subsequent minorities:
That the revocation clause is invalid and inoperative, having been manifestly introduced only for the purpose of substituting, for his antecedent testamentary dispositions. which were mainly in favor of the same donee, the still more liberal provisions of this instrument, and, this object failing, by reason of the entire invalidity of the last intended disposition, the revocation clause falls with the devise to which it was subservient, and to effectuate which it was introduced :
And counsel for the consul-general of France, intervening for alleged foreign next of kin, claimed :
That the bequest, or so-called bequest, of personal property, is also null and void, and of no effect for the same reasons; said bequest being in fact and in law, by the terms of said instrument, a devise of real estate by reason of the directions in said instrument contained, to convert the said personalty into real estate :
That the several provisions in said pretended will, directing that the said property so pretended to be devised should be held for the uses and upon the trusts therein mentioned, and for undetermined and unlimited periods, are, and each of them is, void, as being contrary to the laws and statutes of the State of New York:
If the bequest above set forth stood alone, without any subsequent clauses referring to the personal property, there could be no doubt of its validity as an abso *194 lute gift: and this view, I believe, is not controverted by either of the contesting parties.
The uncertainty of its validity, however, arises from a subsequent clause, but not immediately folio wing'it; (one intervening), and all that follows such bequest in the will is in these words : [The learned surrogate here quoted the residue of the will beginning with the fourth paragraph of clause fourth which will bo found on p. 181, above.]
I therefore now proceed to consider the meaning and legal effect of the clause for the investment of money in real estate property.
In the first place I am satisfied that the clause under which the doctrine of equitable conversion into real estate is claimed, is not limited to the moneys or sums of money left by the testatator, but extends to, and embraces all moneys, whatsoever,, which may, under the will, arise from any portion of the personal property of the testator ; as the language is plain and explicit as' referring to moneys arising./rom any source by virtue of the will. These emphatic words leave no doubt of the testator's intention in respect to the character or meaning of the terms, “money or sums of money.”
The next, and, indeed, primary question concerning the effect of the clause for the investment of moneys in real estate property, is, whether, under it, there was an equitable conversion, at testator’s decease, of the said personal property into real estate ; the argument being, that, if there was such a conversion into real estate, the society, being incapable by law of taking real estate by devise, therefore the bequest under which it is claimed the direction so to convert or invest, was given, is’void and inoperative.
It is my judgment that there was not such an equitable conversion.
In the case of Wright v. Trustees Meth. E. Ch. (Hofman, 202), it is said: “If the purposes for which a *195 sale of real estate is directed by will are illegal, there is no conversion.” “The real and personal property were blended into one fund by a direction that the former should be sold and the latter collected, and the whole applied to the payment of the debts and legacies, and the residue was given by the will to certain corporations : Held, that there was no conversion of the realty (as regards the surplus), the corporations being inca,pable of taking the land.”
So, applying the principle of that case to this will, it would certainly seem to follow that if the society in question, was incapable of taking land, in which the personalty was directed to be invested, 'then, as to the-legatee, there was .not an equitable conversion,—and the direction so to invest is inoperative and void ; and that the society, for whose use and benefit the investment was ordered to be made, would take the personalty as. such, under the direct bequest of the same, bv another clause of the will, in the same manner as if the inoperative subsequent direction had not been inserted; whether the same be regarded as creating an implied trust which can not lawfully be fulfilled, or as only a direction void in law, even if not invalid for repugnancy.
The legal estate of the personal property was not, by the will, in terms, vested in the executors, who were ordered so to invest it in real estate property. It was a naked direction, unless it can be maintained that the testator intended to invest them with the title to the personalty, or created an express trust of such personalty in the executors, or an implied trust, for the uses and purposes mentioned.
Aside from the fact that the clause in question, did not immediately follow the previous absolute bequest to the society, it is noticeable, and not immaterial, that the intervening clause related solely, to the real estate specifically devised and particularly before described ; *196 and the clause relating to the investment of moneys in real estate property is one which commences with the words “I will and order” that all moneys or sums of money which may be so coming to the said society, from any source, &c., shall be invested, &c., thus referring to the absolute ownership before given; and I am now asked, so to construe the directions there given as to investment, that if the same can not be lawfully made in real estate property, for the sole, exclusive and perpetual use, benefit and enjoyment of the said society, that the preceding bequest, absolute in its terms, shall fall with such unlawful directions for investment.
Where a direction to invest the proceeds of land, in land, fails from illegality, they are still regarded as land, and pass to the heir and not to the residuary estate (Thorn v. Coles, 3 Edwards Ch., 330): and, on principle, it is the same as to personal property directed to be invested in land ; if the direction so to invest in land fails from illegality ; it is still regarded as personalty, passing to the next of kin, if not otherwise disposed of or bequeathed under other clauses of the will; and this qualification applies, equally, to the doctrine of the case last cited.
I am unable to discover that the clause for such investment has tha.t great importance ; or that any good reason can be assigned, that could have induced the testator to render the gift, first expressed as absolute, actually dependent upon the subsequent clause; for that would be directly in conflict with the general scope and theory of the will, and would, contrary to his intention, render him intestate as to the personalty, in case the last clause failed; neither can I perceive any good reason to suppose that he should, any the more, have intended to create a perpetual trust in real estate under the clause directing such investments in real *197 estate, than that he so intended, as to the lands which he specifically devised directly to the society.
If the personal property had been directly bequeathed to the execntors, in trust, for the purpose of investment as aforesaid, and there had been no direct bequest to the society, I should not hesitate to pronounce the directions of such investment unlawful, and consequently that such bequest, in trust, would fall with it; as the doctrine of equitable conversion would then apply to it, and the validity of the trust would depend upon the capacity of the society to take real estate by devise ; because the law would not permit them to take indirectly, what they could not take directly ; and even if they could take by devise, the devise would be subject to the question of absolute restriction against alienation by the society, if the preceding clause, referring to the specific real estate devised, applied to the subject of such equitable conversion, which seems to have been claimed on the argument; but, it must be noticed that the restriction contained in the vrill against alienation of real estate, in its terms, refers only to “said real property,” meaning, evidently, the lands before particularly described.
Or, if the testator had employed any words in the clause directing such investment, to show, plainly, his intention that the preceding bequest was conditional upon the directions so given, there might be stronger reason for interpreting the directions as creating a trust; but the clause is without words necessarily importing a trust, or is not so clear, as implying one to be created or intended, that any forced construction should be given to it, which should, or might, defeat and subvert the absolute character of the general bequest of the society. There is certainly no trust created by express words, and none is clearly implied, and if neither is the case, the directions for investment in real estate property should be observed and performed, if *198 they can lawfully be ; but if not, the main purpose and intentions of the testator as to the disposition of his personal property, before absolutely given to the society, should .stand, and courts should seek to effectuate the testator’s intentions, as they may be ascertained from the whole instrument, and not to defeat them. The intentions of a testator are, of course, to be ascertained from an examination of the entire paper, as he executes it; without reference to the validity or invalidity of any of its provisions, for he is not supposed, or presumed, to doubt that effect may be given to all if, contains. It is for the courts to determine whether to all, or to what part; but, so far as the construction of any part depends on testator’s intention, it is to be ascertained, and can only be, by a view of the whole instrument ;■ for that purpose, assuming validity of all its provisions. In this case, it is, in the first place, obvious that t.ho testator intended that none of his relatives near or remote, should share in his estate, real or personal, for no mention is made of any of them, or any provision direct or contingent for their benefit. Next, it is plain that ihe society referred to should be the only beneficiary of his estate} real and personal. No mention is made of any other, to take directly or indirectly, absolutely or contingently. His primary motive, and the pervading purpose of the instrument, throughout, was that the society named should have, use, and enjoy, for its corporate purposes, whatsoever property of any kind or description he should leave at his death. He so expressed himself in unequivocal words in the devise of the real estate, and the bequest of the personalty. He created no trust of the specific realty described, in his executors, for the benefit of the society ; he did not withhold from them the legal title to it, giving them only the equitable use; but he, in express terms, intrusted and devised it directly to them ; and the only peculiar lea hire of that devise, if, indeed, there is that to be said *199 of it, in a legal sense, was, that the society should not alienate the real estate so specifically given to it; but this, if expressive of more than a desire, wish, or recommendation that the real estate should not be alienated, only confirms the singleness of his purpose, that the society should, for its corporate objects, be the sole recipient and possessor of his real estate, and if such was the unreserved or direct control which he intended to confer on the society, by the direct devise of the real estate of which he died seized, there is no presumption to be entertained that lie intended any the less to give the society the direct title to his personal estate and control over the same, and, therefore, no intention to fetter, or expose to defeat, the absolute character of the general bequest, except so far, if at all, as he, in express and unequivocal terms, by the subsequent clause, provided that the title to, or possession of, the personalty should be intercepted or withheld from the society by means of an express trust, or terms of prohibition or restriction against such actual possession of the personal estate ; and if the construction claimed by contestants, of the clause for the investment of the personalty into real estate property is sound in law, it is difficult to harmonize it with the absolute bequest before made, if such construction is that a trust in the executors was created for the perpetual benefit of the society; for if so, there is the incongruity or contradiction of an unqualified gift entitling the legatee to the ownership and possession of the personalty, and a subsequent clause creating a trust which, in effect, declares that the society shall have neither title nor possession, but only the use of its income : no such contradiction orín consistency of intention of a testator, can be presumed ■or entertained of a rational person, unless on the supposition that his mind was changed as he proceeded in ihe declaration of his will.
My conclusions on this portion of the case are : that *200 the direct bequest of the personal estate to the society is valid as an absolute gift; that the subsequent clause under which the doubt has arisen, does not create a trust in perpetuity as real estate, by conversion ; that such last clause amounted only to a direction which was to be executed if i t could lawfully be, so as to vest the personalty converted into real estate, in the society ; that the prospect that the investment could lawfully be so made, does not seem to be the only or principal consideration that induced the testator to make the bequest ; that as the testator had not vested the real estate before specifically devised, in the executors, as trustees, for the benefit of the society, but devised it directly to the society, he, probably no less intended that the real estate in which he directed the personalty to be invested, should be taken by the executors in the name of the society, and not in their names as trustees, and therefore, as well as for other reasons above stated, the clause in question relating to investments does not defeat, but is, or may be fulfilled, in furtherance, and in execution, of the general scheme of the will, apparent from all other parts of it; that as the society could not thus take the bequest in the converted form of real estate, the clause became inoperative, and left the general bequest to take effect as an unconditional and independent gift; and 1 hat if an implied trust was created by the particular clause relating to investments in real estate, it was repugnant to the previous absolute gift, and therefore void ; or, if not so repugnant, but, as an implied trust., could not be lawfully executed, the implied trust falls, and still leaves the previous clause of bequest operative, as necessary to carry out the obvious general intention of the testator.
IY. As to the legal effect of the. revocation clause in the will in question.
It was urged by the counsel for the two legatees Walter Jones and William H. Bell, named in the other *201 instrument, purporting to be a will of earlier date, that the revocation clause in the paper now under discussion, was introduced by testator, only for the purpose of substituting for his antecedent testamentary dispositions in favor of said society, the more liberal provisions of the last, that is to say, of the whole real and personal estate ; and that such object failing, by reason of the entire invalidity of the last instrument, the revocation clause falls with the devise and bequest to which it was subservient, and to effectuate which it was incorporated.
The point so taken by the counsel for the two legatees named in the prior instrument, was maintained on the argument, on account of its importance, in case, and assuming that, it should be determined that the bequest of the personal estate of the testator, as well as the devise, in the will of later date, was void, so that no property of either description would pass under it, and thus (excepting the appointment of executors), leave only the revocation clause standing for consideration. The question would, in that event, be quite a difficult one to decide ; but it is apparent that, from my determination of the validity of the bequest, it is unnecessary to investigate the authorities cited by the learned counsel for those legatees: as a later will bequeathing the testator’s entire personalty, absolutely, and in a form free and clear of all legacies to third persons, is, by the law of this State, ipso facto, a revocation of all former wills of or affecting the same personal estate ; and, consequently, by my decision of the bequest to the society as valid, the legacies in the previous instrument, given to Messrs. Jones and Bell, which could, thereunder, be enforced only against the personalty, are in legal effect annulled, wholly irrespective of the existence or legal effect of an express revocation clause, which, in this case, and with my view of the last bequest, only made express, what was, without it, a legal consequence.
*202 Before concluding my opinion, it is proper to present some well established cardinal principles, and decisions in particular cases, which have aided and guided me in my determination, and may be usefully cited as applicable to the questions arising on the bequest before discussed.
Courts should rather strain, to prevent the divesting of an estate, though not to give an estate that never vested.
An implied intent, or a doubtful implication of different intent, that can not be lawfully effectuated, should give way to and be controlled by, clauses which are express and clear.
In Schettler Smith (41 N. Y. 329), Daniels, J., said: “The will, the construction and effect of which are in controversy, was clearly intended to make a full and final disposition of all the estate, real and personal. Its general tenor and meaning, as well as the particular provisions, devises and bequests made of the property, very clearly show that to have been the design and intent of the testator. And this circumstance must be prominently observed and considered in determining the effect of particular terms and phrases, which standing by themselves, may not be entirely consistent with the execution for that purpose (3 Burrows, 1626).
“And it was stated in terms of similar import by the ■chancellor, in deciding the case of Bond v. Bergh, (10 Paige, 140, 152). He there declares that the intent of the testator, so far as it Is consistent with the rules of law, must, govern in the construction of a will. When, therefore, the intention is apparent upon tho whole will, taken together, the court must give such a construction as to support the intent of the testator, ■even against strict grammatical rules. The observance of this principle is important in this case [Schettler], in view of the circumstances already referred to, that the will renders it entirely clear that the testator did not *203 intend to die intestate as to any portion of his estate, and that intention should be maintained by the construction given to the different clauses in the will,, if that can practicably be done, consistently with the language he has made use of in framing them.”
In general, implication is admissible only in the absence of, and not to control, an express disposition (Rule 11, Jarman on Wills ; Dyer, 330 b.; 8 Rep. 94 ; 2 Vern., 60 ; IP. Wms., 54).
Words, in general, are to be taken in their ordinary and grammatical sense, unless a clear intention to use them in another can be collected (Jarman ; also 18 Ves , 466 ; 4 C. B. N. S., 791), and that, other can be ascertained, and they are in all cases to receive a construction which will give to every expression some effect, rather than one that will render any of the expressions inoperative (3 Ves., 450 ; 7 Id., 458 ; 7 East, 272 ; 2 B. & A., 441) ; and of the two modes of construction, that is to be preferred which will prevent a total intestacy (Cas. t. Talb., 161; 4 Ves.. 406; 2 Mer., 386).
In Parks v. Parks (9 Paige, 107), it is stated that the intention of a testator, as to the disposition of his property, by will, is not to be defeated where such intention can be ascertained upon a careful examination of the whole will, and that intention is not inconsistent with the rules of law.
Where a testators intention can not operate to its full extent, it shall take effect as far as possible (Rule 13, Jarman; Finch, 139; 4 Ves., 325; 13 Id., 486>.
It is a well settled principle of law, that where a will contains distinct and independent provisions devising different portions of the testator’s property, or distinct-estates or interests in the same portions of the property-, some of which provisions are consistent and others inconsistent with the rules of law, the former will be permitted to stand, although the latter are declared to be *204 illegal and void, except where they are so dependent on each other that they can not be separated.
A testator is rather to be presumed to calculate on the dispositions in bis will taking effect, than the contrary (Rule 24, Jarman). It was said in Jenkins v. Hughes (8 H. L. Cas., 571; 6 Jur. N. S. 1043), that whether a general intent or a particular intent expressed in a will is to prevail, must depend on the context of the whole will, in construing which the words of a technical kind are not necessarily to receive a technical meaning.
Full effect should be given to the particular intent, as well as to the general intent of the testator, so far as his particular intent can be ascertained by the will, and as is consistent with the rules of law, and with his general intent; which general intent must control in a will (Parks v. Parks, 9 Paige, 107).
It is necessary to give full effect to special intentions of a testator, so far as they can be ascertained by the will and are consistent with the rules of law, as well as to his general intention as to the disposition of bis property after his death. The rule of construction in such cases is to give effect to the whole of the language of the testator in expressing his particular intent, provided it is not inconsistent with the general construction of the will (1 Roberts on Wills [3 Lond. Ed] 356; Dawes v. Swan, 4 Mass. 208).
There is no rule of more universal application, both here and in England, that the plain and unambiguous words of the will must prevail, and are not to be controlled or qualified by any conjectural or doubtful constructions growing out of the situation, circumstances or condition, either of the testator, his property, or his family (Bunner v. Storm, 1 Sandf. Ch., 357; Mann v. Mann, 14 Johns., 1; Parsons v. Winslow, 6 Mass., 175 ; Dawes v. Swan, 4 Mass., 208).
1 here is, perhaps, no rule of construction of more *205 universal application to wills, or which oftener requires tobe acted upon, than that every portion of the instrument must be made to have its just operation, unless there arises some invincible repugnance, or else some portion is absolutely unintelligible (Norris v. Beyea, 13 N. Y, 273, 283).
In Chrystie v. Phyfe (19 N. Y., 344), Strong, J., states the leading doctrines applicable to the construction of wills in a very clear and forcible manner; as that the language used shall receive its ordinary interpretation, except where some other is necessarily or clearly indicated; and where words are equivocal, that meaning shall be adopted which will tend to preserve consistency, in preference to one which will create inconsistency, and, if possible, some effect shall be given to each distinct provision of the will, rather than it should be annihilated (1 Redfield on Wills, 432 ; Hone v. Van Schaick, 3 N. Y., 538; 3 Barb. Ch., 488 ; 3 Brad. Surr., 230; 16 Barb., 412; 13 N. Y, 98).
In 35 N. Y., 162, the court affirms the rule, that it is proper to incline towards such a view as will render the instrument legal and operative, rather than the opposite.
If the words of the will be such that they may be construed in two different senses, one of which would render the disposition made of the property illegal and void, and the other would render it valid, the court should give that construction to the language that will make the disposition of the property effectual (Butler v. Butler, 3 Barb. Ch., 310; Mason v. Jones, 2 Barb., 230).
A clearly expressed intention in one portion of the will, is not to yield to a doubtful construction in any other portion of the instrument (Corrigan v. Kiernan, 1 Brad. Surr. 208 ; Brown v. Lyon, 6 N. Y., 419).
When the testator’s general or primary intention appears, the court, in order to give it effect, would sacri *206 fice to it a particular or secondary intention inconsistent with it (Lovett v. Kingsland, 44 Barb., 567, and cases cited).
In Kane v. Astor (5 Sandf., 467), it was held, that in construing a will, the court must give full effect to every part of it, if lawful, and to single words as well as to sentences and paragraphs. But it is a permanent principle that the court shall carry out the general intent of the testator ; and where a particular word or sentence is repugnant to the general intent and design of the whole will, or tends to render it incongruous or insensible, such word or sentence must give way, rather than sacrifice the whole scheme of disposition disclosed by the general tenor of the instrument.
It is true, as a general rule, that where a gift or trust is void by statute, as a disposition in favor of persons or objects prohibited from taking, or in a manner forbidden, as in violation of statute, or where the gift contravenes some policy of the law, as tending to a perpetuity, a trust to the extent of the estate given, will will result to the donor or his heirs, or legal representatives, but only so, if it is not otherwise disposed of.
In Webb v. Wools, (2 Sim. N. S., 267), Kendersley, V. G., said, “Where the later words of a sentence in a will go to cut down an absolute gift, contained in the first part of a sentence and are inconsistent with such gift, the court will, if it can, give effect to the absolute gift.”
If two parts or provisions of a will are repugnant, so that both can not stand, the last will prevail, unless other parts of the will forbid it (Bradstreet v. Clark, 12 Wend., 602; Covenhoven v. Shuler, 2 Paige, 122 ; Mason v. Jones, 2 Barb., 229; Parks v. Parks, 9 Paige, 107 ; Leggett v. Perkins, 2 Comstock, 207, 306).
A subsequent clause, apparently irreconcilable with precedent provisions, will be construed in connection with them, and may be rejected, if repugnant to the *207 intention of the testator as derived from the whole will (Bradley v. Amidon, 10 Paige, 235).
It sometimes happens in wills that there are clauses inconsistent with each other, in which case both can not take effect. In such a case it becomes the duty of the court to select one ox the other. In analogy to the fact that the last will of a testator is to prevail in preference to the earlier one, the courts have adopted from necessity a similar rule, and treated the subsequent words in the will as indicating a subsequent intention unless, indeed, there be other expressions in the will which malee it apparent that the first should ialce effect (Sims v. Doughty, 5 Vesey, Jr., 247; Constantine v. Constantine, 6 Id., 102 ; Parks v. Parks, 9 Paige, 124 Dawes v. Swan, 4 Mass., 215; Sweet v: Chase, 2 Comstock, 73, per Ruggles, J).
A bequest to a man, generally, of money or personal property is an absolute legacy, and in such a case a subsequent direction to the executors to put the money at interest for the support of the legatee does not in any manner revoke or qualify the gift. It merely relates to the investment, and being inconsistent with the absolute title before given to the legatee, it is null and void. Fo valid qualification can be attached to a full title to personal property (Dorland v. Dorland, 2 Barb.» 65).
In Beck v. McGrill, 9 Barb., 35, the devise was to a married woman for life, “ subject to the powers and limitations therein expressed,” followed by an appointment of her husband as trustee “to take possession of the property so devised, receive the rents and apply the same to her use during her life, as she should direct; ” and by a codicil, other property was devised to her for life, “ subject to the same restrictions, limitations and powers in trust specified in my will.” Held, that the-power being inconsistent with the devise was void, and that the devisee took an unshackled estate for life.
*208 When an absolute interest is given to the legatee, a devise over is void for repugnancy (11 Wend., 275).
No precise form of words is necessary to create a ■condition in wills. But whenever the intention of the testator is clearly manifested that the legacy should depend on a condition, and the condition is not repugnant to the estate or contrary to the rules of law, the intention will be carried into effect (Shep. Touch., 433; Pink v. Thuisey, 2 Mad., 157).
If a legacy is given upon the performance of a condition subsequent, which is illegal, the rule at common law, and by the civil law adopted in courts of equity, is the same, and the condition is void and the legacy is absolute, freed from the condition and is as if no condition had been annexed to it. It is upon this principle that conditions and qualifications inconsistent with and repugno/nt to the gift, are wholly void and are to be ■rejected. This rule is well illustrated by a case decided by Lord Alvawley, Master of the Rolls. Lord A. said : “I find it laid down as a rule, long ago established, that where there is a gift with a condition inconsistent with and repugnant to such gift, the condition is wholly void. A condition that tenant in fee shall not aliene is repugnant, and there are many other cases of the same sort. In all these cases the gift stands, and the condition or exception is rejected” (Bradley v. Peixot, 3 Vesey, 324; Schermerhorny. Negus, 1 Denio, 448).
If a good bequest is made to a legatee, subject to an illegal or void direction to accumulate, as where such direction is independently engrafted upon the bequest, and can be stricken out without destroying the substantial form of the gift, the gift may be held to be good, but the direction to accumulate void (Haxton v. Corse, 2 Barb. Ch., 506 ; Craig v. Craig, 3 Id., 76 ; Martin v. Maugham, 14 Sim., 230 ; Williams v. Williams, 4 Selden, 525 ; Phelps v. Pond, 23 N. Y., 69 ; Kilpatrick *209 v. Johnson, 15 Id., 322; Hanley v. James, 5 Paige, 318; Philadelphia v. Girard, 45 Pa St., 1).
In Darling v. Rogers (22 Wend., 483), ifc was settled by the court of errors that where real estate is awarded upon two or more trusts, some of which are legal and the others are void or unauthorized by law, the title passes to the trustee, so far as is necessary for the purposes of the authorized trusts, notwithstanding the provision of the revised statutes, which declares that where an express trust shall be created for any purpose not authorized by those statutes, no estate shall vest in the trustee.
Executors take possession of the personalty of the testator, as trustees in law for the legatees thereof, if any are named in the will; and if the direction in question under this testator’s will, as to investment of personalty in real estate, constitutes a trust express orimplied, and is void, it still leaves the personalty in their hands, as trustees, for the lawful purpose of delivery, at the proper time, to the society, as legatee thereof under the general bequest of the will.
These views comprise all that need be said on the various points submitted by counsel upon the questions of the validity of the devise and bequest arising in the case, and a decree will be entered accordingly, as well as for the admission to probate of the paper so propounded as the last will of deceased, bearing date February 14, 1871, and adjudging that the instrument of earlier date, offered for probate, was revoked and annulled by the will so admitted.
Decree accordingly.*

 JSTo appeal was taken.

 There are three methods of presenting the testimony of a medical ■expert in such a case. 1. If the witness was the medical attendant ol the person whose capacity is in question, or has adequately examined him, he may testify to his opinion as to such person's capacity, especially if his opinion is given in connection with his statement of the facts of the person’s condition. For recent illustrations of this method, see People v. Montgomery, (13 Abb. Pr. N. S., 207); Macfarland’s Trial, (8 Id., 57). 2. Amedical expert who has heard all the testimony adduced upon the trial hearing upon the mental condition, may give his opinion on the question of what the facts proved or claimed to be proved, indicate as to the mental condition (see People v. Lake, 12 N. Y. (2 Kern.) 358; affirming 1 Park. Cr., 495). 3. A medical expert, may be asked what a supposed state of facts put to him hypothetically, but corresponding in details to the facts already in evidence on the trial, would indicate as to the mental condition. Ib, The case in the text is an instance of the latter method.